**JACWIL MFRS., Plaintiff-Appellant,**

v.

**BATESVILLE CASKET COMPANY, Inc., Defendant-Appellee.**

**No. 13741.**

United States Court of Appeals Seventh Circuit.

Dec. 21, 1962.

Patrick H. Hume, Chicago, Ill., Clyde F. Willian, Byron, Hume, Groen & Clement, Chicago, Ill., for appellant.

Thomas M. Scanlon, Indianapolis, Ind., Edmund P. Wood, Cincinnati, Ohio, Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., Truman A. Herron, William G. Konold, Wood, Herron & Evans, Cincinnati, Ohio, for appellee.

Before DUFFY, CASTLE and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This appeal arises from a declaratory judgment action instituted by plaintiff, Jacwil Mfrs., to have Letters Patent No. 2,664,615 (hereinafter referred to as the '615' patent) declared not infringed or, if infringed, invalid. Defendant, Batesville Casket Company, Inc., assignee of the '615' patent, counterclaimed for patent infringement.[1] After a trial without jury the District Court entered judgment for defendant. Plaintiff was enjoined from infringing or contributing to the infringement of the patent.

---

1. Throughout this opinion reference will be made to two Hillenbrand patents. Mr. Hillenbrand, Secretary of the Batesville Casket Company and also its Production Manager, was copatentee and assignor to Batesville of Letters Patent 2,664,615 (the patent in suit), issued on January 5, 1954. In addition, he was the patentee and assignor to Batesville of Letters Patent 2,964,824, issued on December 20, 1960. Both patents deal with casket interior units and herein are referred to as the '615' patent and the '824' patent respectively.

Plaintiff seeks a reversal on the ground that the file wrapper history of the patent narrowly confines the scope of the patent claims and hence the District Court erred in applying the doctrine of equivalents so as to encompass the accused structure.

The subject matter of the patent in suit relates generally to the interior trim or decoration of burial caskets, and particularly to molded cardboard inserts for lining the interior of metal casket lids. These inserts greatly reduce the time required to line a casket lid and permit unskilled labor to be used with a concomitant savings in labor costs. The Batesville insert, covered by the '615' patent, comprises a rectangular frame of rigid side and end frame members rigidly fastened at their abutting ends. A center panel is stapled to the inner marginal portions of the frame members. The frame members are constructed of single face corrugated cardboard curved over forms or "webs" to provide a convex face which simulates an upholstered roll. A marginal flange member is formed along the inner edges of the frame members for stapling the same to the center panel. The webs are constructed of several laminations of corrugated board secured together by adhesive. The corrugated board is cut along a curved profile approximating the desired curvature of the frame members. As such the webs constitute a rigid truss section. The webs are secured along their profiled surface to the corrugations of the single face by adhesive. Thus, the corrugated board is maintained in a curved configuration conforming to the profile of the webs.

The ends of the frame members are configurated so as to constitute mitred corners when in the abutting relationship. At the ends of each of the frame members are a plurality of tabs or flanges (hereafter referred to as tabs) which are bent inwardly at substantially right angles thereto. The tabs on abutting frame members are stapled together in a face-to-face relationship whereby the frame members constitute a rigid frame assembly. A suitable lining of silk or the like is stretched over the frame members and is secured thereto by stapling and/or adhesive. The silk lining is stretched over the ends of each frame member and the tabs thereon. Thus, when two frame members are joined in right angular fashion, the lining folded over the ends is stapled between the tabs. The appearance resulting is that of an upholstered mitred corner.

Plaintiff's accused insert is indistinguishable from defendant's when viewed in its final upholstered condition in a casket lid. Inspection of the two constructions, however, shows that the webs are absent from the frame members of the accused device and there are no tabs at the abutting corners as described in the '615' patent. In place of webs, the accused device employs corrugated board formed in a curve at right angles to the corrugation grooves with a chipboard glued face-to-face to the corrugated board in this configuration. When the corrugation grooves are on the convex side, the corrugations are forced into a much wider spatial relationship than if uncurved. When the chipboard is glued to the corrugations it fixes the corrugations in the spatial relationship they had previously assumed. After the glue has hardened the curved form is set and will not return to its former uncurved condition.

As for the mitred corners there appears to be much disagreement between the parties as to the difference between a mitred joint and a cope joint (the latter being claimed as descriptive of the corner joint of the accused device). Merriam-Webster's New International Dictionary (unabridged) Third Edition (1961), lists the word "cope" as a verb-transitive and not as a noun. We view both joints as being miter joints in their final appearance. We do not believe it is the appearance here that is patentable but rather the means or method used in arriving at the mitred appearance.

The accused device does not include inwardly turned flanges or tabs at the ends of the frame members. The longitudinal members are merely cut or shaped to conform to the shape of the transverse mem-

ber. The overlapping of the longitudinal frame member on the transverse member may occur over a substantial portion of the transverse member's length and results in a line of overlap that is at a 45° angle to both the longitudinal and transverse members. The longitudinal and transverse members are not permanently fixed in relation to one another until they have been matched with a casket lid. The fact that the longitudinal member can overlap the transverse member over a substantial range of the transverse member's length permits the accused insert to be tailored to fit varying lid dimensions and still maintain a mitered corner. This flexibility is not present when tabs as described in the '615' patent are used.

 We are thus faced with a situation in which the two inserts in their ultimate upholstered appearance are, or may be, identical. As already noted it is not the appearance but rather the structure utilized in arriving at the appearance that constitutes the patented invention. The claims of the '615' patent are the measure of invention. Graver Tank

& Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The District Court recognized the limitations present in the claims of the patent regarding the profiled webs used to reinforce the frame members of the insert and also the tabs or flange used at the corners to form the mitered appearance. This recognition is contained in the District Court's findings of fact 17 and 18 [2] in which the trial judge applied the doctrine of equivalents in determining that the accused device contained all the essential elements of the '615' patent.

The significance and validity of this determination of equivalency depends on findings of fact 19 and 20.[3]

██ For reasons to be discussed, we hold that the scope of the claims of the two Hillenbrand patents is limited by their prosecution history and hence finding of fact 19 is clearly erroneous. Thus limited the patent claims cannot be expanded by the doctrine of equivalents so as to embrace those particulars excluded by the prosecutional history of the patent. Lewis v. Avco Manufacturing

2. Finding of fact 17 reads:
"In claims 6 and 7 of defendant's patent, the frame members are described as constituted by paperboard material configurated to display a curved face, and a plurality of webs secured to the inner face of each of the frame members to maintain the curvature. The patent drawings show three to five such webs secured to the inner face of the members. Plaintiff does not employ the particular webs shown in the patent drawings. Rather, the plaintiff secures an elongated strip of corrugated paperboard to the inner face of the members to maintain the curvature. The plaintiff's longitudinal strip of corrugated paperboard may be considered to be a plurality of individual transverse strips (or webs) of corrugated paperboard integrally joined into a single elongated strip. The longitudinal strip employed by the plaintiff is found to be substantially the same means as the claimed plurality of webs in that it accomplishes the same result in substantially the same way as the plurality of webs."
Finding of fact 18 reads:
" * * * The structure employed by plaintiff is the mechanical equivalent of

the flanges secured together as claimed by the defendant in claims 9 to 13 in that the plaintiff's structure is adapted to perform the same result (a neat mitred corner) by substantially the same means functioning in substantially the same way (the abutting and overlapping frame members stapled at their corners and around the tacking frame in the peripheral edges of the casket top or inserted in the channel)."

3. Finding of fact 19 reads:
"The prosecution history of the two Hillenbrand Patents in no way limits the scope of the patent claims in issue and particularly the scope of such claims set forth in these Findings as covering and embracing the casket interior units or components thereof which plaintiff has made, used and sold presently and in the past and such units assembled from such components supplied by plaintiff and sold by plaintiff's customers presently and in the past."
Finding of fact 20 reads:
"Plaintiff's structure in its component parts and the assembled unit does not follow the prior art, but follows defendant's patent."

Corp., 228 F.2d 919 (7th Cir., 1956). Of necessity, finding of fact 20, flowing from an erroneous application of the doctrine of equivalents, must also fail as being clearly erroneous.

When each of the claims in suit are studied, it is apparent that each calls for a rectangular frame having mitred corners and attached to a central panel. In addition, each claim calls for the supporting profiled webs and/or the tabs at each mitred corner.

On each occasion when the inventor attempted to submit a claim which did not include either the tabs or the webs the claim was rejected by the Patent Examiner. Several letters exchanged between the Examiner and the inventor in response to submitted claims reveal the inventive-level characteristics of the structure for which the patent in suit ultimately issued. On June 14, 1951, the Examiner wrote:

"In view of the fact that it is old in the casket art to make removable casket top interior units, applicant is requested to condense the first six pages of the specification of this application to not more than two pages.

\* \* \* \* \* \*

"Claims 4, 7 and 11 are rejected as unpatentable over Bowler (1) which discloses an interior unit 26 for a casket top comprising a rectangular frame constituted by four frame members formed of cardboard and each configurated at the ends to provide mitred joints, \* \* \* casket lining fabric 16 facing each frame member, and a central panel supported by said frame. To construct the Bowler unit 26 of 'corrugated' paper board would involve only a matter of choice not amounting to invention, nor would it require any invention to dispose the corrugations lengthwise of the frame members. It would be obvious to one skilled in the art that the corrugations should be disposed lengthwise of the members since the cardboard is easier to bend with the corrugations disposed in this manner."

On December 12, 1951, Hillenbrand submitted proposed amendments to his patent in answer to the Examiner's letter of June 14. Each of the new claims included reference to the webs or tabs except for claim 17.[4] In the remarks at the end of the letter the writer pointed out that "[t]he claims of the new set are directed to the details of construction of the unit which give it its rigidity and make the frame and the central panel individually, self-sustaining sub-assemblies." The remarks continued:

"In addition to the self-sustaining feature, it is to be noted that each of the new claims describes the frame members as being configurated 'to display a curved face outwardly.' This configuration is neither shown nor suggested in the Bowler disclosure and not only adds considerably to the inherent strength of the frame members but, in addition, simulates the appearance effected by genuine upholstery techniques.

\* \* \* \* \* \*

"\* \* \* Claim 17 is directed specifically to the self-sustaining nature for the construction of the frame \* \* \*. *Claim 18 adds to the recitation of Claim 17, the webs which are used to strengthen the frame member.*" (Emphasis supplied.)

Claim 17 is the only new claim in which tabs or webs were not mentioned. In response to these proposed amendments the Examiner, on August 14, 1952 wrote:

"Claim 17 is rejected as defining nothing patentable over each of the Bowler patents of record. To make

4. Claim 17 read:
"An interior unit for a casket top comprising a self-sustaining rectangular frame having side and end members constituted by paper board material configurated to display a curved face outwardly and a self-sustaining panel of shallow dish-like configuration secured marginally to the inner edge of the frame to constitute a rigid assembly adapted to be inserted as a unit in the top of the casket."

the side and end members of the frame shown in Figs. 1, 2 and 8 of Bowler (1) and in Figs. 15, 16 of Bowler (2) curved outwardly and to make the center panel of these units of shallow dish-like configuration would involve only mechanical skill not amounting to invention. The configurations of these portions of the units appears to be purely a design feature, the recitation of which is not sufficient to patentably distinguish over the prior art."

Claim 18 was allowed in the same letter. As noted, this differed from Claim 17 only in the addition of the webs which are used to strengthen the frame members.

On October 27, 1952, the inventor again submitted proposed amendments. This letter contained the following remarks:

"* * * The result is a rigid, self-sustaining frame having casket lining material in the mitred crevices. The combination of the curvature, the mitred joints, inwardly turned flanges and mitred crevices is suggested nowhere in the prior art.

"The advantage of having a self-sustaining frame in a casket interior unit of the type described can be seen from the photographs. For one thing, the central panel does not have to be a structurally strong element. It undoubtedly adds to the overall rigidity of the unit, but it is believed to be apparent that cloth or other limp material could be utilized in place of paperboard, for example."

One more documentary examination serves to further delineate the scope of invention of the patent in suit. In 1957, Hillenbrand filed an application for a patent covering improvements in casket interior units. This application subsequently resulted in the issuance of Letters Patent Number 2,964,824 (referred to as the '824' patent). Some of the language contained in this latter patent helps to explain what it was that the inventor deemed of substantive importance in his first patent. The '824' patent reads in part as follows:

"This patent discloses a prefabricated interior unit constituted by corrugated paperboard, pasteboard or light sheet materials covered by an upholstering fabric which is adapted to provide a pleasing appearance. In general, these inserts, or interior units, have comprised a rectangular central panel surrounded by a frame constituted by four frame members, one on each side. Also, in general, it has been customary to bow the frame members inwardly to simulate upholstering and *to maintain the bow of the sheet material of the frame members by means of stays attached to the insert on the side opposite to the exposed side.*

\* \* \* \* \* \*

"The improved prefabricated insert or interior unit of this invention is an improvement over the interior unit of Patent No. 2,664,615 in that it can be much more rapidly fabricated with less material and with the requirement for less skill than the interior unit of the patent. *Particularly,* the unit of this invention *does not require the stays* for bowing the frame members of the patent and further \* \* \*.

\* \* \* \* \* \*

"The construction of the interior unit of this invention is superior to the construction of the interior unit of Patent No. 2,664,615 regardless of the manner by which the interior unit is attached to the inside of the casket top *because the construction dispenses with the use of stays for stabilizing the frame members.* In other words, in the preferred construction of Patent No. 2,664,615, the frame members are relatively rigid and self-sustaining, whereas the frame members of this invention are relatively flexible and are held in the desired configuration only after the interior unit is placed in the casket top whereby the flanged

joints stabilize the positions of the inner margins of the frame members and the attachment to the casket top stabilizes the positions of the outer margins of the frame members." (Emphasis supplied.)

From this it can be surmised that the need for stays or webs in the '615' patent was a nuisance and the patentee recognized that these stays were a vital part of his original patent. This frame of mind seems justifiable from the quotations we have recited above and we believe that the entire file wrapper history of the '615' patent, and the '824' patent as above noted calls for a compression of the scope of the claims to a much narrower range than that allowed by the District Court.

The file wrapper history shows that a self-sustaining frame with stays or webs giving strength as well as form to the frame members, and with mitred corners made possible by stapled tabs or flanges at the abutting ends—also adding to the strength of the whole—constitute the essence of the '615' invention. This was not a pioneer invention in the field of casket inserts, but rather was an improvement on the prior art, and the correspondence with the Examiner sustains this view. Looking through the correspondence to the patents cited by the Examiner convinces us that the Examiner's position would have been sustained had the applicant chosen to contest his decisions. Particularly is this so with regard to Bowler Patent Number 2,181,504, and Bowler Patent Number 2,044,967.

The District Court applied the doctrine of equivalents in its findings of fact 17 and 18. In so doing it found the chipboard glued to the corrugated board to be an equivalent of the stays or webs mentioned in the '615' patent. In view of our discussion we must disagree. To grant the equivalence in this instance would be to give to the '615' patent a scope broad enough to encompass that which the Patent Office refused to allow. The stays, being rigid and perpendicular to the plane of corrugated board, added strength to the frame and a rigidity that was called for in the claims. The

accused device uses a chipboard that permits flexibility—an attribute that is one of the very desirable features of its design. In this context we cannot hold it to be an equivalent when an exact duplication of the patented item, with its basic characteristic of rigidity, would destroy that particular feature which is most novel in the component utilized by the accused device. The same may be said about the tabs or flanges used at the corners. These are mentioned again and again in the claims as the means by which a mitred corner may be achieved, and they add considerably to the self-sustaining rigidity of the patented insert. Again, to classify as an equivalent a feature that is designed to permit flexibility in the accused insert and which lacks any of the attributes called for by the patented insert, save for final appearance which we have already said was not patented, would grant to the patentee a monopoly over casket lid inserts not anticipated by the Patent Office and would seriously call into question the validity of the patent in light of the file wrapper history already discussed.

We realize that each case must stand on its own facts. Particularly is this true where file wrapper estoppel is raised as a defense to an infringement action. The line between what is patentable and what has been properly disallowed must be recognized when applying the doctrine of equivalents. In this regard it is well to recall what was said by Judge Major in Lewis v. Avco Mfg. Corp., 228 F.2d 919, 925 (7th Cir., 1956):

"If the difference between tweedledum and tweedledee represented the margin between the prior art and the patent as allowed, the patentee would not be heard to assert that such difference was of no consequence on the issue of infringement."

For the foregoing reasons the trial judge erred in holding that plaintiff infringed defendant's patent. Accordingly, the judgment of the District Court is reversed.